1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| M.M. as guardian for her minor daughter, O.M., | Case No. 3:21-cv-05865-TMC |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| TACOMA SCHOOL DISTRICT No. 10; MEGAN CLARK; SANDRA HOLMES; MELISSA PORTER; KATHERINE HOLMES, as Personal Representative of the Estate of Stephen Holmes, | |
| Defendants. | |

## I.   INTRODUCTION

This case arises from the allegations of Plaintiff M.M., on behalf of her minor daughter O.M., that O.M. suffered sexual abuse at the hands of her kindergarten classmates in 2013, and that Defendants' inadequate response to earlier classroom incidents make them responsible for that abuse.[1] Before the Court are Defendants' motions for summary judgment. Dkt. 69, 71, 74. Defendants move for dismissal of all O.M.'s claims with prejudice. *Id*. Many of Defendants' arguments hinge on O.M.'s credibility and the reliability of her memory and testimony. But those questions must be resolved by a jury and not by this Court. Construing the record in the light most favorable to O.M., and drawing all reasonable inferences in her favor, a reasonable jury could find for O.M. on her federal Title IX claims and her claims of negligence and outrage under Washington state law. On her constitutional claims, however, O.M. has failed to put forth sufficient evidence that Defendants' actions violated her constitutional rights. For these reasons, as explained further below, Defendants' motions are GRANTED IN PART and DENIED IN PART.

## II.   PROCEDURAL HISTORY

On November 30, 2021, O.M. filed a complaint against Defendants Tacoma School District No. 10 (the "District"), Sandra Holmes ("Ms. Holmes"), Megan Clark ("Ms. Clark"), Stephen Holmes ("Principal Holmes"), and Melissa Porter, alleging their acts and omissions led to O.M.'s sexual abuse by fellow students in her kindergarten class and constituted (1) a violation of her due process and equal protection rights under the Fourteenth Amendment; (2) creation of a hostile educational environment in violation of Title IX of the Education

---

[1] To avoid confusion, when discussing the substance of her claims, the Court will typically refer to O.M. as the Plaintiff and to the claims at issue as O.M.'s claims, while recognizing that as a technical matter M.M. brings the claims on O.M.'s behalf.

Amendments of 1972 ("Title IX"); and (3) negligence, gross negligence, and outrage under Washington State common law. Dkt. 107. O.M. amended her complaint on July 27, 2023. Dkt. 81. O.M. filed a second amended complaint on November 1, 2023, to substitute Katherine Holmes, the personal representative of the estate of Stephen Holmes, in place of Defendant Stephen Holmes after he passed away on April 9, 2023.[2] Dkt. 103, 107.

On July 13, 2023, the District moved for summary judgment on all of O.M.'s claims. Dkt. 69. Ms. Clark and Porter did the same. Dkt. 71. On July 17, 2023, Ms. Holmes moved for summary judgment as well. Dkt. 74. On July 31, 2023, O.M. responded to their motions. Dkt. 83, 85, 86. The District, Ms. Clark, and Porter replied on August 4, 2023 (Dkt. 90, 91) and Ms. Holmes replied on August 7, 2023.[3] Dkt. 95. The case was transferred to the undersigned judge on August 30, 2023.

## III.  FACTUAL BACKGROUND

The following factual summary is based on "the evidence in the light most favorable to the" non-moving party, O.M., with "all justifiable inferences" drawn in her favor. *Tolan v. Cotton*, 572 U.S. 650, 651, 656 (2014) (per curiam).

### A.  The start of the 2013–2014 school year and first classroom incident.

O.M. began kindergarten in September 2013 in Room 8 at Grant Elementary School ("Room 8"), part of Tacoma School District No. 10. Dkt. 84-11 at 3. Ms. Holmes had been

---

[2] Due to the time taken for procedural steps in response to Stephen Holmes's death, the Estate of Stephen Holmes was not named as a Defendant at the time of the dispositive motion deadline and has not filed a motion for summary judgment. The Court will address this issue with the parties in a forthcoming status conference.

[3] In the District's reply brief, it moved to strike O.M.'s response, arguing it "appears" that the response is over the word limit. Dkt. 90 at 1. The Court has performed its own word count and concludes the response is at most 15 words over the limit, depending on what the word processing software includes in the count. The motion to strike is denied.

assigned to teach Room 8 but went on medical leave before classes started. *Id.* Principal Holmes hired Ms. Clark to substitute teach in Room 8 during Ms. Holmes's medical leave. *Id.* at 3–4.

Early in the school year, Ms. Clark received a report from student U.V.'s mother that another student, J.P., had put his hands down U.V.'s pants and touched her "private bottom area." Dkt. 84-3 at 5–6; Dkt. 84-4 at 1; Dkt. 84-5 at 4. Ms. Clark and Principal Holmes met with the families of both students and assured U.V.'s parents they would "take action in stopping J.P." Dkt. 84-3 at 5; Dkt. 84-4 at 1. Despite this assurance, Ms. Clark did not implement a "formal safety plan" and later described the touching as a "he said, she said incident." Dkt. 84-3 at 6. According to Porter, the counselor, she made an "inquiry" to Child Protective Services ("CPS") who informed her the incident did not "rise to the level to make a report." Dkt. 70-4 at 3.

Ms. Holmes returned from medical leave on December 4, 2013, Dkt. 84-11 at 4. According to Ms. Clark, she informed Ms. Holmes that student J.P. had been reported previously for touching U.V.'s "bottom" and that she had been "keeping an eye on" J.P and staying "mindful" of both J.P. and U.V., Dkt. 84-3 at 5–6. Ms. Clark also said she told Ms. Holmes that J.P. and U.V. should "be separated in the classroom" and "it was not a good idea to let students go into the bathroom in pairs." *Id.* at 6; Dkt. 70-3 at 7.[4] Ms. Clark had instituted a bathroom pass system for Room 8 where only one student at a time was allowed in the bathroom connected to the classroom. Dkt. 84-3 at 5. Ms. Holmes and Ms. Clark overlapped in teaching Room 8 and at parent-teacher conferences held December 4–6, 2013. Dkt. 3 at 1.

---

[4] Ms. Holmes told investigators that "no one had made her aware of any touching type incident between J.P. and U.V. earlier in the year." Dkt. 84-3 at 6. This claim, however, was contradicted by emails written by Ms. Holmes in which she referenced the earlier incident between J.P. and U.V., *id.* at 7, and a hearing officer later found "[t]here was no question that this incident did occur and Ms. Holmes was told about this in December," Dkt. 84-5 at 4. There is no genuine factual dispute as to whether Ms. Holmes was informed of the fall 2013 incident between J.P. and U.V.

**B.      Ms. Holmes's return to the classroom and receipt of multiple complaints.**

Ms. Holmes took over as the sole teacher in Room 8 after December 6. *Id*. On January

13, 2014, Ms. Holmes received an email from the mother of U.V. expressing concern that J.P.

had told U.V. that he would give U.V. his snack if she let him touch her. Dkt. 84-4 at 1. U.V.'s

mother asked Ms. Holmes how U.V. could transfer from Room 8 "to a different classroom" and

if she could forward the email to Principal Holmes. *Id.* Ms. Holmes did not report this allegation

to law enforcement or to CPS, and there is no evidence she took any steps in her classroom to

prevent further incidents.

At some point "a couple of weeks" after Ms. Holmes returned to the classroom (either

late December or early January 2014), she told counselor Porter that "J.P. has a touching

problem and you need to get him help" and that J.P. had "been touching kids in my class."

Dkt. 84-3 at 5. Porter informed Principal Holmes of this "general allegation," *id.*, but no further

action was taken, and no report to law enforcement or CPS was made.

On January 16, 2014, after Ms. Holmes had taught Room 8 for approximately six weeks,

Principal Holmes met with Ms. Holmes and gave her a "written directive" (the "directive")

outlining several incidents related to Ms. Holmes's management of Room 8 that had been

reported to Principal Holmes. These included a general deterioration in classroom learning,

Ms. Holmes releasing Room 8 students to adults not on the contact list, having a parent she did

not know watch the classroom while she went to the staff room, grabbing students by the shirt or

arm to line up, failing to know students' names after six weeks of instruction, disciplining a

student with a "time out" lasting one-and-a-half hours, failing to provide homework packets, and

having students answer the classroom phone. Dkt. 84-2 at 1–2.

The directive stated that Ms. Holmes's conduct violated district and state regulations,

including Washington Administrative Code 181-87-060 prohibiting "assessment, treatment,

instruction, or supervision of students" in "flagrant disregard or clear abandonment of generally recognized professional standards." *Id*. at 1. Principal Holmes directed her to remedy the deficiencies noted and to follow school district policies and regulations, with failure to do so leading to disciplinary action including termination. *Id*. at 2. The District's 30(b)(6) designee testified in deposition that the behaviors outlined in the directive "violated Tacoma School District policy and endangered students." Dkt. 84-1 at 10.

In the weeks following the directive, Principal Holmes received additional complaints about Ms. Holmes's management of Room 8. On January 23, 2014, Principal Holmes received a complaint from a parent who had stopped by Room 8 to find the students had been left unsupervised. Dkt. 84-3 at 1. When Ms. Holmes returned "after a minute," *id.*, she asked the parent to watch Room 8 while she went to the staff lounge to "grab something to eat" despite not knowing the parent. Dkt. 84-5 at 3. The parent stated she saw "a student kick another student several times" and that she was afraid to have her son "in such a chaotic and unstable environment." *Id.* Principal Holmes then performed a classroom observation of Room 8 on January 31, 2014, stating that "[s]tudent safety is a very large concern." Dkt. 84-3 at 2. During the classroom observation, one student crawled away from the group and colored on a whiteboard unnoticed by Ms. Holmes for 20 minutes and another student was left behind during a fire drill until a parent volunteer brought the student to Ms. Holmes. Principal Holmes noted that, "[c]lassroom and building routines are not followed well . . . Not only is this a safety concern" but students were also not learning. *Id.*

**C.      February 2014 incidents, investigations, and Ms. Holmes's termination.**

On February 5, 2014, Ms. Holmes reported an incident to Principal Holmes where another student, T.F., "dropped her pants and underwear in the presence of her class." Dkt. 84-5 at 5–6. Ms. Holmes stated that this was not the first time this had happened. *Id*. Ms. Holmes also

wrote to Principal Holmes that "J.P.'s behavior is getting worse with my girls." Dkt. 84-3 at 7.

Then, on the afternoon of February 7, 2014, T.F.'s mother called Principal Holmes because T.F. had told her that earlier that day another student, B.F., had crawled under her desk, pulled down her pants, and licked her genitals while Ms. Holmes was with another group of students. Dkt. 84-3 at 2; Dkt. 84-5 at 7. Principal Holmes reported the incident to the Tacoma Police Department ("Tacoma Police") on February 10. That same day, Ms. Holmes was placed on administrative leave for failing to adequately supervise her students, Dkt. 84-3 at 3, and Ms. Clark returned to teach Room 8. *Id*. at 6. When Ms. Clark returned, she observed that "students were using the bathroom whenever they wanted, with multiple students getting up to go to the bathroom at the same time," and that "the students were rough with each other, pushing, shoving, cuddling and holding hands and crawling under tables." *Id.*

Tacoma Police investigated the February 7 incident, and the District also engaged the law firm Preg O'Donnell & Gillette ("Preg O'Donnell") to investigate separately. Preg O'Donnell arranged for Shawn Ann Flood of the law firm Kampbell Andrews & Arbenz PLLC to investigate allegations that Ms. Holmes did not adequately supervise Room 8. Dkt. 83 at 6; Dkt. 84-3. A Tacoma Police detective interviewed students from Room 8 on February 18, 2014. Dkt. 84-3 at 3; Dkt 84-7. In her March 27, 2014 report, Flood summarized the Tacoma Police detective interviews as follows:

- B.F. denied to the detective that he had pulled T.F.'s pants down and licked her but reported that T.F. and J.P. had previously "gotten in trouble for being found in the bathroom together." Dkt. 84-3 at 3.

- T.F. told the detective that it was indeed B.F. that pulled her pants down and another student, M.N. had seen the incident. T.F. stated she had been in the Room 8 bathroom with J.P. but did not provide additional detail. *Id*.

- M.N. told the detective that it was J.P., not B.F., who was involved with T.F. in the February 7 incident. M.N. reported that J.P. had also asked her to remove her clothes at school, but she had refused.

- The detective also interviewed J.P., who stated that he "saw" T.F. pull her pants down from under a table but "didn't want to see it." Dkt. 84-7 at 5. The detective also asked J.P. about the Room 8 bathroom and he stated that T.F. had "got right there too" but that he had only heard of rather than seen any activity. J.P. also said that O.M. "did that too" where O.M. pulled her pants down. He told the detective that he had wanted to tell a teacher but gave up because O.M. kept pulling her pants up and down. *Id*.

After these interviews, M.N.'s parents reported to Principal Holmes that M.N. had told them J.P. had asked to touch M.N. in the vaginal area in the Room 8 bathroom. M.N. also told her parents that J.P. had either urinated on M.N. or had asked her to urinate on him. Dkt. 84-3 at 3. Following these reports, Principal Holmes "emergency expelled" J.P. from Grant Elementary School on or around February 18, 2014. *Id*.

Flood interviewed Ms. Holmes regarding Room 8 and the reported incidents. *Id*. at 6–8. Ms. Holmes told Flood she had stopped using the bathroom pass system instituted by Ms. Clark. She admitted that she had "seen a bunch" of her students "run and go in the bathroom" before she would make them line up, but she denied that she had ever found students in the bathroom together. Ms. Holmes also stated that J.P. "went to the bathroom a lot." *Id*.

On May 13, 2014, the District terminated Ms. Holmes's employment. The District concluded from its investigation that Ms. Holmes failed to safely supervise her students, resulting in students "engaging in sexual activity in the classroom." Dkt. 84-6 at 1. The District also determined that Ms. Holmes had failed to report child abuse or neglect despite being a mandatory reporter, created an unsafe learning environment, and left students unattended for periods of time without adult supervision. *Id*. The District's letter described Ms. Holmes's failures as "exceptional misconduct" that "put your students at grave risk of danger." *Id*. at 15.

### D.    O.M.'s recollection of abuse in the classroom.

O.M. was in the foster care of M.P. while enrolled at Grant Elementary School. Dkt. 69 at 2–3. After moving from M.P.'s foster care to an interim adoptive family, O.M. eventually began

living with M.M and her family in July 2019. *Id.* M.M. is in the process of adopting O.M. and currently acts as O.M.'s legal guardian. *See* Dkt. 61; Dkt. 69 at 2–3. O.M. has recounted to M.M. memories of abuse that took place while she was in foster care and with her former adoptive family. Dkt. 69 at 2–3. Sometime in 2020, M.M. received a call from a private investigator informing her that O.M. may have been involved in some "incidents" at Grant Elementary School. Dkt. 65-2 at 6. Subsequently, in 2021, M.M. asked O.M. whether she remembered "what happened in kindergarten." Dkt. 55-7 at 3; *see* Dkt 69 at 5. O.M. initially did not recall her kindergarten experience because it was "blacked out." Dkt. 55-7 at 3. After O.M. and M.M. "went over" O.M.'s kindergarten experiences together "40 to 50 times," O.M. stated she remembered certain things after discussing them "step by step." Dkt. 55-7 at 3, 17.

O.M. testified in her deposition that "in the middle of the [2013–2014] school year" male classmates urinated on her and three of her friends in the Room 8 bathroom. Dkt. 65-1 at 12–13.[5] O.M. could not recall the names of her classmates but remembered that she had initially seen the male classmates urinating on her friends and had run to help her friends before also being "pushed down" and urinated on. *Id.* O.M. recalled that her male classmates then pulled her and her friends' clothes off "to put their private parts next to ours." *Id.* at 13. She also recalled that her male classmates "moved their private parts on the girls" *Id.* at 15. O.M. stated that she did not know if any students told the teacher about what happened in the bathroom and that she did not tell the teacher because she thought she "would also get in trouble." *Id.* at 16. She stated that she was "upset and a little bit mad" about the incident but that she did not tell her foster mother at the time, M.P., about what happened. *Id.* at 18.

---

[5] O.M. also submitted a declaration in opposition to the summary judgment motions. Defendant Holmes moved to strike the declaration. Dkt. 95 at 2. The Court has not relied on the declaration in ruling on the motions and therefore DENIES the motion to strike as moot.

In M.P.'s deposition, she testified that O.M. had "exceptional" struggles during her kindergarten year. Dkt. 84-10 at 7. M.P. also testified that O.M. had told her a story that "sounded as if she was conveying that a student was engaging in oral sex in the kindergarten classroom," *id.* at 8, but that she dismissed it at the time because "I would never have believed [. . .] that would be taking place," *id.* at 11.

## IV.   DISCUSSION

### A.   Summary judgment standard.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And a fact dispute is "material" "only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim for which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

The evidence relied upon by the nonmoving party must be able to be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). Even circumstantial evidence, however, can defeat a motion for summary judgment if the inferences drawn in the non-moving party's favor are reasonable. *McLaughlin v. Liu*, 849 F.2d 1205, 1208–09 (9th Cir. 1988). "'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). Whether a witness is credible is "a determination that is exclusively within the

province of the factfinder at trial, not the district court on summary judgment." *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1035–36 (9th Cir. 2005).

### B.     O.M. has not put forth evidence sufficient to find a violation of clearly established Due Process rights.

"[T]he Due Process Clauses [in the Fifth and Fourteenth Amendments] generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). Due process is a limitation on state action rather than a "guarantee of certain minimal levels of safety and security." *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019) (quoting *DeShaney*, 489 U.S. at 195). Accordingly, the Fourteenth Amendment typically "'does not impose a duty to protect individuals from third parties.'" *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011) (quoting *Morgan v. Gonzales*, 495 F.3d 1084, 1093 (9th Cir. 2007)). The "'general rule is that [a] state is not liable for its omissions.'" *Id.* at 971 (quoting *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000)). There are, however, two exceptions: (1) the special-relationship exception and (2) the state-created danger exception. *Id.* at 971–72.

"The special-relationship exception does not apply when a state fails to protect a person who is not in custody." *Id.* at 972. In the school setting, "[c]ompulsory school attendance" and the responsibility of teachers acting in the place of parents during school hours "do not create 'custody' for the purposes of the special-relationship exception." *Id.* at 973.

A state-created danger exists if there is "affirmative conduct on the part of the state in placing the plaintiff in danger" and "the state acts with 'deliberate indifference' to a 'known or obvious danger.'" *Patel*, 648 F.3d at 974 (quoting *Munger*, 227 F.3d at 1086); *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1996); *see also Wills v. City of Monterey*, 617 F. Supp. 3d 1107,

1123 (N.D. Cal. 2022) (citing *Martinez*, 943 F.3d at 1271). The government must have "affirmatively created an actual, particularized danger [the plaintiff] would not otherwise have faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1063 (9th Cir. 2006). Examples of affirmative acts include a prison assigning a nurse to work alongside a dangerous sex offender despite assurances she would not need to work with such individuals, *see L.W.*, 974 F.2d 119, or police officers ejecting an intoxicated individual from a bar wearing only a T-shirt into below freezing temperatures where the individual died of hypothermia, *see Munger*, 227 F.3d 1082.

Here, O.M.'s due process claims must be dismissed because she has not shown evidence of affirmative government conduct that "created an actual, particularized danger" she "would not otherwise have faced." *Kennedy*, 439 F.3d at 1063. O.M.'s theory of liability, and the evidence she has presented, is entirely based on omission—the failure of Ms. Clark, Ms. Holmes, counselor Porter, and Principal Holmes to respond adequately to J.P. touching U.V. and possibly other female students, leading to the abuse of O.M. The specific conduct O.M. argues satisfies this standard includes "not taking measures to control" the male classmates; "not informing Sandra Holmes that J.P. inappropriately touched female students"[6]; failing to remove Ms. Holmes from the class earlier after numerous parent complaints; failing to make another CPS report; and Ms. Holmes's failure to supervise the classroom. *See* Dkt. 83 at 18. Though O.M. attempts to rephrase some of these allegations as affirmative conduct rather than omissions, they all hinge on the Defendants' failure to act, and they do not meet this Circuit's standard for establishing a state-created danger.[7]

---

[6] As previously noted, the Court concludes there is not a genuine question on this material fact, and that Plaintiff's own evidence demonstrates Ms. Holmes was informed of the earlier incident.

[7] O.M.'s citation to *Doe v. New York Dept. of Soc. Servs.*, 649 F.2d 134 (2d Cir. 1981) for the proposition that a failure to report child abuse can alone amount to a Due Process violation is

Because O.M. has not put forth sufficient evidence for a reasonable jury to find a violation of her due process rights, the Court need not address whether the individual defendants would be entitled to qualified immunity. Nor does the Court need to address whether there is sufficient evidence of a policy, custom, or practice to establish *Monell* liability, because there is insufficient evidence of an underlying constitutional violation. *See Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994) ("While the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights.").

### C.      O.M.'s equal protection claims are not adequately asserted.

"To establish a § 1983 equal protection violation, the plaintiffs must show that the defendants, acting under color of state law, discriminated against them as members of an identifiable class and that the discrimination was intentional." *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134 (9th Cir. 2003). "A long line of Supreme Court cases make clear that the Equal Protection Clause requires proof of discriminatory intent or motive." *Navarro v. Block*, 72 F.3d 712, 716 (9th Cir. 1995) (emphasis in original) (citations omitted).

O.M.'s complaint alleges that Defendants violated her equal protection rights, *see* Dkt. 107 at 14–15, but she has not addressed that claim in her response to the summary judgment motions or put forth any evidence of an equal protection violation. Accordingly, the Court dismisses O.M.'s equal protection claims.

### D.      There is enough evidence to sustain O.M.'s Title IX claims against the District.

Title IX states that no person "shall, on the basis of sex . . . be denied the benefits of, or

---

unpersuasive. In *Doe*, the plaintiff child was in state foster care, and the court's decision was grounded in the principle that "[w]hen individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the nonfeasance of which may violate the constitution." *Id.* at 141. In other words, *Doe* is a special-relationship case. In the instant case, the Defendants were not O.M.'s governmental custodians.

be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has held that Title IX gives a right of action against institutions but does not authorize "suit against school officials, teachers, and other individuals." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 247 (2009). Although district courts have divided on this question and the Ninth Circuit has yet to address it, most courts have concluded that Plaintiffs cannot bring Section 1983 claims against individuals based on Title IX because this "'would permit an end run around Title IX's explicit language limiting liability to [federal] funding recipients.'" *Doe v. Napa Valley Unified Sch. Dist.*, No. 17-CV-03753-SK, 2018 WL 4859978, at *4 (N.D. Cal. Apr. 24, 2018) (quoting *Doe v. Town of Stoughton*, 917 F. Supp. 2d 160, 165 (D. Mass. 2013)).

"Sufficiently severe" student-on-student sexual harassment can "rise to the level of discrimination" if the educational institution shows deliberate indifference to the sexual harassment. *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649–51 (1999). The educational institution must have actual knowledge of the harassment and it must be so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided. *Id.* ("[a school] district's knowing refusal to take any action in response to such behavior would fly in the face of Title IX's core principles, and such deliberate indifference may appropriately be subject to claims for monetary damages.").

"In sexual harassment cases, it is the deliberate failure to curtail known harassment, rather than the harassment itself, that constitutes the intentional Title IX violation." *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 967 (9th Cir. 2010). The Supreme Court has held that there are "limited circumstances" where schools "may be liable for their failure to respond to the discriminatory acts of certain nonagents," such as when a harasser "is a student rather than a

teacher." *See Davis*, 526 U.S. at 642–44. In *Davis*, the Supreme Court determined school districts could be liable for student misconduct occurring "during school hours and on school grounds" because the activity was "taking place 'under' an 'operation' of the funding recipient." *Id.* at 646. However, an educational institution would be liable for unresponsiveness to student-on-student harassment only where it is on notice. *See id.* at 646–47 ("recipients of federal funding may be liable for subjecting their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment.") This requirement of "actual" notice means the harassment must be brought to the attention of a person "who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf." *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739 (9th Cir. 2000) (quoting *Gebser*, 524 U.S. at 290). A funding recipient is "deliberately indifferent to acts of student-on-student harassment" where "the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 649–50.

O.M. asserts Title IX claims against both the District and the individual defendants. Dkt. 107 at 14–16. The Court dismisses O.M.'s individual claims because there is no right of action against individuals under Title IX and Section 1983 may not be used to bring such an action. *See Fitzgerald*, 555 U.S. at 247; *Napa Valley Unified* at *4.

As for the District, O.M. claims that the District failed, despite "ample notice," to implement any procedures "to ensure that male students like J.P. were supervised" to prevent abuse and harassment of other students. Dkt. 83 at 27. Viewing the evidence in the light most favorable to O.M., the Court concludes that a reasonable jury could find actual notice of the harassment to a District employee with "authority to address the alleged discrimination," *Reese*, 208 F.3d at 739, and a "clearly unreasonable" response "in light of the known circumstances," *Davis*, 526 U.S. at 649–50.

As set forth in the factual summary above, by December 2013 Ms. Clark, Ms. Holmes, Porter, and Principal Holmes all knew that J.P. had reportedly put his hands down the pants of a female student, U.V. Ms. Clark and Principal Holmes met with both sets of parents, but despite assuring U.V.'s parents they would "take action in stopping J.P.," no "formal safety plan" was adopted, and Ms. Clark later characterized the report as a "he said, she said" incident. Dkt 84-4 at 1; Dkt 84-3 at 5–6. Ms. Clark had instituted a bathroom pass system in Room 8 to allow only one student into the bathroom at a time, but Ms. Holmes abandoned that system when she returned to the classroom. Dkt. 84-3 at 5. Although Ms. Holmes was informed about J.P. touching U.V., there is no evidence she took any measures to prevent further abuse when she resumed control of the classroom; to the contrary, the overwhelming evidence shows that she let the class descend into chaos through what the District later characterized as "exceptional misconduct." Dkt. 84-6 at 15.

By mid-January, U.V.'s parents had informed Ms. Holmes that J.P. had again asked U.V. to let him touch her. Dkt. 84-4 at 1. In late December 2013 or early January 2014, Ms. Holmes informed Porter again, in her capacity as a school counselor, that J.P. had "a touching problem and you need to get him help" and that J.P. had "been touching kids in my class." Dkt. 84-3 at 5. According to Porter, she informed Principal Holmes of this "general allegation," *id.*, but she took no further action and made no report to law enforcement or CPS. By January 16, Principal Holmes had informed Ms. Holmes in writing that her mismanagement of the classroom "endangered students," but there is no evidence of additional steps taken to protect the students. Dkt. 84-1 at 10. On February 5, Ms. Holmes wrote to Principal Holmes that "J.P.'s behavior is getting worse with my girls," Dkt. 84-3 at 7, and a few days later Ms. Holmes was placed on leave after the assault on T.F. in the classroom. A reasonable jury could conclude from this evidence that Ms. Holmes, Porter, and Principal Holmes were all employees with authority to

address the alleged discrimination; that all three had actual notice of repeated instances of sexual harassment by J.P.; and the lack of any additional response or preventative measures following Ms. Holmes's return to the classroom was clearly unreasonable in a kindergarten setting.

The District's argument in support of summary judgment is based on two theories. First, the District argues that there is insufficient evidence to conclude O.M. was abused at all, because "O.M.'s testimony is insufficient evidence to create fact issues given her known lapses in truthfulness and credibility." Dkt. 69 at 9, 12. The District cites no authority for this argument, and there is none; questions of credibility are reserved for the trier of fact. *See Dominguez-Curry*, 424 F.3d at 1035–36. As discussed further below with respect to the negligence claims, although Defendants' credibility arguments might prevail at trial, a reasonable jury could also conclude from O.M.'s testimony and the circumstantial evidence that O.M. was abused by the same students and during the same time period as the other victims in her kindergarten class.

Second, the District argues that it cannot be liable under Title IX because the alleged harassment *of O.M. specifically* was not reported until many years later, so the District did not have "actual notice." Dkt. 69 at 14–16. The District cites only *Reese* for this argument, but *Reese* does not address this question—the school in *Reese* had no notice of harassment from any victim. 208 F.3d at 740. In any event, after the briefing in this case was complete, the Ninth Circuit rejected this argument in its *en banc* opinion in *Brown v. Arizona*, 82 F.4th 863 (9th Cir. 2023), concluding that a university's knowledge that a student "had repeatedly and violently assaulted two other female undergraduates during his freshman year" was sufficient notice under Title IX. *See id.* at 866, 880–81. In this case, the District's notice of multiple allegations that J.P. had touched or attempted to touch U.V. under her clothes, had a "touching problem," and had been "touching kids" in the class—especially when combined with the overall lack of supervision in the classroom—is sufficient evidence of actual notice to the District that action

was required to fulfill its obligations under Title IX and prevent further harassment of

kindergarten students in Room 8.

### E. Washington state law claims.

#### 1. There are triable issues of fact for O.M.'s claims of negligence and gross negligence.

O.M. claims that the District and individual defendants acted with negligence and gross

negligence in breaching their duty to protect her under Washington state law. Dkt. 83 at 12–16;

Dkt. 107 at 16. Negligence under Washington law requires proof of "(1) the existence of a duty

to the plaintiff, (2) breach of that duty, (3) resulting injury, and (4) proximate cause." *Degel v.*

*Majestic Mobil Manor, Inc.*, 914 P.2d 728, 731 (Wash. 1996). In the school context, an

"established Washington rule" provides "that a school has a 'special relationship' with the

students in its custody and a duty to protect them 'from reasonably anticipated dangers.'"

*Christensen v. Royal Sch. Dist. No. 160*, 124 P.3d 283, 287 (Wash. 2005).

In its summary judgment motion, the District makes only a conclusory argument that

O.M. has failed to present sufficient evidence for her negligence claims. *See* Dkt. 69 at 25.

Ms. Clark and Porter do not address the negligence claims at all in their summary judgment

motion, and seem to concede there is sufficient evidence for the negligence cause of action by

concluding their brief with the argument: "Plaintiff's effort to Constitutionalize state law

negligence claims is unsuccessful." Dkt. 71 at 18. These conclusory requests for summary

judgment are not sufficient to meet the moving party's initial burden under Rule 56, and the

motions by the District, Ms. Clark, and Porter on the negligence claims must be denied on that

basis alone. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary

judgment always bears the initial responsibility of informing the district court of the basis for its

motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories,

1    and admissions on file, together with the affidavits, if any" which it believes demonstrate the

2    absence of a genuine issue of material fact."); *see also id.* at 328 (White, J., concurring) ("It is

3    not enough to move for summary judgment without supporting the motion in any way or with a

4    conclusory assertion that the plaintiff has no evidence to prove his case.").

5         In any event, the Court's discussion of the evidence supporting O.M.'s Title IX claim

6    applies with equal force to the state negligence claims. Viewing the evidence in the light most

7    favorable to O.M., a reasonable jury could conclude that the defendant employees, and through

8    them the District, repeatedly failed to exercise reasonable care in response to multiple reports of

9    sexualized touching by J.P., and that these failures led to the foreseeable abuse of O.M.

10        Ms. Holmes argues that O.M.'s claims should fail as a matter of law because O.M. cannot

11   remember exactly when during the school year the abuse occurred, and therefore cannot establish

12   that any alleged abuse took place while Ms. Holmes was responsible for Room 8. Dkt. 74 at 14.

13   This argument is unpersuasive. First, it goes only to direct evidence—O.M.'s testimony about

14   the events. But summary judgment can be defeated by both direct and circumstantial evidence,

15   *see McLaughlin*, 849 F.2d at 1208, and here a reasonable jury could combine O.M.'s testimony

16   with the circumstantial evidence of the breakdown in classroom supervision after Ms. Holmes's

17   return and the timeline of reported abuse by other students to conclude, on a more likely than not

18   basis, that O.M.'s abuse occurred in the same timeframe and was committed by the same

19   classmates.[8]

20

21   ─────────────────────

     [8] Ms. Holmes argues in reply that much of the evidence attached to O.M.'s response is based on
22   hearsay contained in police reports and records of the District's internal investigation. Dkt. 95 at
     7–8. But the question at summary judgment is whether the evidence is *capable* of presentation in
23   an admissible form, *see* Fed. R. Civ. P. 56(c)(2), and nothing in the summary judgment record
     establishes that the substance of O.M.'s evidence cannot be presented through either live
24   testimony or documents subject to a hearsay exception. The admissibility of what O.M. chooses
     to present will be determined at trial.

More broadly, Ms. Holmes's argument—if taken to its logical conclusion—would deny a remedy to the most vulnerable victims of sexual abuse. Victims who are young children, or who live with disabilities impacting communication, or who were impaired or restrained at the time of their abuse often may not be able to identify their abuser or remember exactly when the abuse took place. But that does not prevent them from succeeding in court, so long as there is other competent evidence from which a jury could find each element of their claim. In this case, if a jury credits O.M.'s testimony and draws reasonable inferences in her favor from the circumstantial evidence, it could make the necessary findings despite the gaps in O.M.'s memory about alleged abuse that occurred many years ago when she was very young.

At summary judgment, the Court "does not weigh disputed evidence with respect to a material fact. Nor does the judge make credibility determinations . . . . These determinations are within the province of the factfinder at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The parties do not dispute that Defendants had a duty to O.M. *See Christensen*, 124 P.3d at 287. The other elements of O.M.'s negligence claim turn on numerous factual questions regarding the extent of Defendants' knowledge of what was happening in Room 8, the adequacy of their response, the reliability of O.M.'s memory, and the credibility of her testimony. These are genuine issues of material fact that preclude summary judgment. *Villiarimo*, 281 F.3d at 1061.

O.M. also claims that Defendants were grossly negligent in their alleged failure to protect her from a "reasonably anticipated" danger of sexual abuse by failing to comply with mandatory reporting requirements and through an "egregious" lack of oversight in Room 8. Dkt. 83 at 15–16. Gross negligence is "the absence of even slight care." *Dole v. Goebel*, 407 P.2d 807, 810 (Wash. 1965). Washington state uses simple negligence "as the baseline for comparison" with gross negligence and the Washington Supreme Court explains that the absence of slight care is

where an actor exercises "'substantially or appreciably' less than that degree of care which the reasonably prudent person would exercise in the same or similar circumstances." *Harper v. State*, 429 P.3d 1071, 1077 (Wash. 2018) (citation omitted). Additionally, because gross negligence can "turn[] on a fine-grained factual analysis" it is "generally not susceptible to summary judgment." *Swank v. Valley Christian Sch.*, 398 P.3d 1108, 1120 (Wash. 2017). For example, the Washington Supreme Court found that summary judgment on both negligence and gross negligence claims was improper where a plaintiff had provided evidence that a volunteer coach failed to remove a student athlete showing signs of concussion from play because there was a triable issue as to the coach's "degree of fault." *See id*. at 1121.

Here, O.M. has asserted that the Defendants' acts and omissions constitute gross negligence, pointing to the District's own finding that Ms. Holmes acted "in flagrant disregard or clear abandonment of generally recognized professional standards" and committed "exceptional misconduct" that put students at "grave risk of danger," leading to "kindergarten students engaging in sexual activity in the classroom." Dkt. 83 at 15; Dkt. 84-6 at 14–15. O.M. also argues that Ms. Holmes and Porter were grossly negligent in failing to make mandatory reports of suspected child abuse, *id.* at 16, and the District itself concluded that Ms. Holmes's misconduct included a violation of that duty to report. Dkt. 84-6 at 12.

The District argues that its employees exercised at least "some" degree of care and therefore the gross negligence claims should be dismissed. Dkt. 69 at 24. Ms. Clark, Ms. Holmes, and Porter do not address O.M.'s claims of gross negligence at all, and therefore have not met their initial burden on summary judgment. *See* Dkt. 71, 74. The Court finds that there is a triable issue of gross negligence in this case. As with the coach in *Swank*, a reasonable jury could find that Defendants should have taken significantly more steps in response to reports of serious student injuries. *Swank*, 398 P.3d at 1120. Here, instead of a concussion, Defendants

may have acted with substantially or appreciably less than ordinary care to prevent or report

sexual abuse in a kindergarten classroom. The Court finds that determining such a "degree of

fault" requires "fine-grained factual analysis" unsuitable for summary judgment. *Id.*

Accordingly, O.M.'s claims regarding gross negligence survive summary judgment as to all

Defendants.

> *2.* **O.M.'s outrage claim survives summary judgment.**

O.M. also claims all Defendants committed the tort of outrage against her. Dkt. 83 at 28;

Dkt. 107 at 17. O.M. asserts that Defendants' failure to adequately investigate, further report, and

abate the sexual harassment of classmates in Room 8 and Ms. Holmes's continued assignment to

Room 8 despite "60 parents complaints lodged against her" constitute outrage. O.M. claims

Defendants' behavior was reckless, exposed her to sexual abuse, and caused her severe

emotional distress. Dkt. 83 at 28.

Claiming outrage requires plaintiff to show "(1) extreme and outrageous conduct, (2)

intentional or reckless infliction of emotional distress, and (3) severe emotional distress on the

part of the plaintiff." *Reid v. Pierce Cnty.*, 961 P.2d 333, 337 (Wash. 1998). The Washington

Supreme Court has opined that an employer may be vicariously liable for the outrageous acts of

an employee if "the employee was fulfilling his or her job functions at the time he or she

engaged in the injurious conduct." *Robel v. Roundup Corp.*, 59 P.3d 611, 621 (Wash. 2002).

Extreme and outrageous conduct must be "so outrageous in character, and so extreme in degree,

as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized community." *Kloepfel v. Bokor*, 66 P.3d 630, 632 (Wash. 2003)

(quoting *Grimsby v. Samson*, 530 P.2d 291, 295 (Wash. 1975)). The conduct would lead "an

average member of the community . . . to exclaim 'Outrageous!'" *Id*.

The District and Ms. Holmes argue that none of the behavior specified by O.M. meets the

standard for outrage under Washington law. Dkt. 69 at 23; Dkt. 74 at 13. Ms. Clark and Porter do not address the issue of outrage and therefore have not met their burden on summary judgment. *See* Dkt. 71. O.M. does not assert any affirmative, *intentional* conduct by Defendants. *See supra* at 2–10. However, a reasonable jury could conclude—despite the high legal bar—that the record shows extreme and outrageous conduct, reckless infliction of emotional distress, and O.M.'s resulting severe emotional distress. *Reid*, 961 P.2d at 337. The District argues that this case is analogous to *Boy 1 v. Boy Scouts of America*, 832 F. Supp. 2d 1282, 1291 (W.D. Wash. 2011), in which another court in this district dismissed an outrage claim at summary judgment based on the failure of Boy Scouts of America ("BSA") to warn plaintiffs about widespread problems of pedophilia and child abuse within the organization. *Id*. The District quotes the court's reasoning that "[a]bsent allegations that BSA had some specific knowledge that Plaintiffs might be in danger of sexual assault by their scout leaders," the organization's failure "simply does not rise to the level of extreme, outrageous behavior.*" Id.*

But in this case, a reasonable jury could conclude that the District and its employees did have "specific knowledge" that kindergarten students in Room 8, including O.M., were in danger of sexual abuse by their classmates. As the court in *Boy 1* recognized, *see id.*, under Washington law the inquiry on summary judgment for an outrage claim is "whether reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability.*" Robel*, 59 P.3d at 619. It is not inconceivable that a reasonable jury would exclaim "outrage" at the failure of *any* teachers or school officials to adequately respond to alleged sexual abuse in a kindergarten classroom, particularly considering the District's own findings that Ms. Holmes's misconduct was "exceptional" and "in flagrant disregard or clear abandonment of generally recognized professional standards." Dkt. 84-6 at 14–15. And the District could be vicariously liable for the reckless, outrageous behavior of its employees under Washington law. *See Robel*, 59 P.3d at 621.

- 23

Accordingly, O.M.'s outrage claim also survives summary judgment.

**F.      O.M.'s punitive damages claims against the District are dismissed.**

The "general rule today is that no punitive damages [against municipalities] are allowed unless expressly authorized by statute." *Cook Cnty., Ill. V. U.S. ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quoting *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 260, n.21 (1981)). And while monetary damages may be recoverable in a Title IX action, punitive damages are not. *See Barnes v. Gorman*, 536 U.S. 181, 185–88 (2002); *Mercer v. Duke Univ.*, 401 F.3d 199, 202 (4th Cir. 2005). Accordingly, O.M.'s claims for punitive damages against the District under Title IX are dismissed.

## V.      CONCLUSION

For the reasons stated above, the Court ORDERS as follows:

1.      The motions for summary judgment (Dkt. 69, 71, 74) on O.M.'s claims under 42 U.S.C. § 1983 (counts I and II of the operative complaint, including the constitutional and Title IX claims against the individual defendants) are GRANTED. These claims are DISMISSED with prejudice.

2.      The motions for summary judgment are otherwise DENIED.

3.      The parties are ordered to confer and submit a joint status report within 14 days of the filing of this order addressing (1) potential trial dates and (2) the parties' proposal for addressing the inability of Defendant Katherine Holmes, as the personal representative of the Estate of Stephen Holmes, to participate in the summary judgment briefing. The Court will then set a scheduling conference to determine the trial date and remaining pre-trial deadlines.

Dated this 17th day of January, 2024.

Tiffany M. Cartwright
United States District Judge